**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 29, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JAMES KEITH BEIERLE,

    Defendant - Appellant.

No. 16-8040
(D.C. No. 2:13-CR-00098-NDF-1)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.
_____

In February 2014, James Keith Beierle was convicted of being a felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). At his first sentencing

hearing, the district court reviewed Beierle's criminal history from the 1980s, which

included state felony convictions for burglary, robbery, and possession of a weapon

by a prisoner. The court determined that these three convictions qualified as violent

felonies under the residual clause[1] of the Armed Career Criminal Act (ACCA), 18

U.S.C. § 924(e)(2)(B)(ii). Beierle's status as an armed career criminal required the

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The residual clause included in ACCA's definition of a "violent felony" any
offense that "involves conduct that presents a serious potential risk of physical injury
to another." 18 U.S.C. § 924(e)(2)(B)(ii).

district court to impose a mandatory-minimum fifteen-year sentence. But the next year, while Beierle's direct appeal was still pending, the Supreme Court struck down ACCA's residual clause on vagueness grounds. *See Johnson v. United States*, 135 S. Ct. 2551, 2557, 2563 (2015).

In response to *Johnson*, we reversed Beierle's ACCA-imposed fifteen-year sentence while affirming his conviction. *See United States v. Beierle*, 810 F.3d 1193, 1201–02 (10th Cir. 2016) [*Beierle I*]. On remand, the district court resentenced Beierle to seventy-seven months of imprisonment under the U.S. Sentencing Guidelines. Beierle now attacks that sentence, too, arguing that the district court miscalculated his total offense level by adding two levels because his offense "involved three or more firearms," *see* U.S. Sentencing Guidelines Manual § 2K2.1(b)(1) (U.S. Sentencing Comm'n 2013), and by adding another four levels because he "used or possessed any firearm . . . in connection with another felony offense," *see id.* § 2K2.1(b)(6)(B). Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we affirm Beierle's sentence.

## BACKGROUND

Beierle's current troubles began on a Sunday afternoon in January 2013 at a truck stop in Burns, Wyoming. Beierle was standing in the checkout line when he met a couple—Mr. Redfern and his wife, Ms. Nygren—whom he eventually invited to "hang out" and drink beer at his shop. Supp. R. Vol. IV at 563.

After about three hours, Redfern and his companions left, and Beierle thought that they had gone for good. But when he went back into his house, Beierle saw

2

Redfern's five-year-old daughter still there, playing with his own daughter. Beierle asked his daughter what was going on, and she replied that Redfern had come in, said that he would be right back (but not where he was going), and left the little girl. At first, Beierle was "shocked"—"[h]e couldn't believe that these people that he had just met had left their daughter with him." Supp. R. Vol. Ib at 131. Then Beierle grew "uncomfortable" and "angry" at Redfern for leaving the child in his care. Supp. R. Vol. V; Supp. R. Vol. Ib at 131.

The sun set and two hours passed before Redfern called to say that he was on his way back to pick up his daughter. As soon as Redfern's car pulled up to the shop, Beierle sent the little girl over to her father, and she climbed in the backseat of the car.

Meanwhile, in front of the shop, Redfern approached and verbally confronted Beierle. By this point, Beierle was "very angry"; he wanted Redfern to take the little girl and leave his property. Supp. R. Vol. Ib at 134. Beierle was so angry, in fact, that he never could remember exactly what Redfern said, only that the man had "become mouthy[,] rambling on about a lot of nothing," Supp. R. Vol. IV at 564, and "talking crap, mumbo jumbo," Supp. R. Vol. Ib at 135. So Beierle sent his own daughter toward the back of the shop and picked up an assault rifle that he'd set just inside the doorway. Supp. R. Vol. Ib at 136.

Holding the gun, Beierle told Redfern, "You need to get the hell out of here." Supp. R. Vol. II at 318. Redfern reacted by warning Beierle to "[g]et the gun out of [his] face" and grabbing, unsuccessfully, at the barrel. Supp. R. Vol. Ib at 138.

3

Beierle replied that he "wouldn't waste a bullet on him." Supp. R. Vol. II at 318. Instead, while standing within ten feet of Redfern, Beierle fired a few rounds to the west, into a stand of trees. Scared, Redfern got back in the car. But then he "mouthed off a little more," so Beierle fired a few more rounds in the opposite direction, toward a pasture. Supp. R. Vol. II at 312. Redfern closed the car door and started the car down the driveway. About 150 to 200 feet away from the shop, however, the car's brake lights flashed on, and Beierle, who had followed Redfern about 30 feet down the driveway, fired two more rounds into the pasture. At last the car—and Redfern— left. Only then did Beierle feel "secure" enough to lock the rifle in a gun safe in his garage.[2] Supp. R. Vol. V.

At 6:24 that evening, the local sheriff's department received a 9-1-1 call about an incident involving a firearm and "shots fired" at Beierle's property. Supp. R. Vol. II at 355. After speaking with Redfern and his companions about the incident, the responding deputies tried to speak with Beierle by phone but got no answer. At about 8 or 9 p.m., two deputies drove out to Beierle's property. Though they saw lights on inside the house, no one answered when they knocked on the door. Nor did they find anyone in the shop. Next to the shop door, however, the deputies noticed four spent shell casings. They found two more shell casings between twenty and forty feet down the driveway. All six casings were .223 caliber, and their locations fit "the description of events" that Redfern and his companions had provided to the deputies.

---

[2] The shop and garage are separate structures, two of several outbuildings on Beierle's property.

Supp. R. Vol. Ib at 114. So too did the presence of gunshot residue on Redfern's hat, shirt, and pants.

Two days after the incident, Deputy Wilson—whom Beierle had known for over a decade—convinced Beierle to give "his side of the story." Supp. R. Vol. Ib at 125. In a recorded interview that day, Beierle described meeting "some bad cats down at the truck stop." *Id.* at 127. He had made a mistake, he told Deputy Wilson, to invite these strangers to his property, and he "should have just called the sheriff's department" when he discovered the little girl still in his house. *Id.* at 133. But he hadn't. Instead, Beierle admitted to Deputy Wilson that he had fired a .223-caliber assault rifle into the air to get Redfern to leave, because Redfern had grown "mouthy" when he had returned to pick up his daughter. Supp. R. Vol. II at 301. Deputy Wilson asked "very specifically" what Redfern had said to provoke this reaction, but Beierle responded, "I don't remember. I was angry. I just wanted them to leave. [Redfern] was talking crap, mumbo-jumbo." Supp. R. Vol. Ib at 134–35. Deputy Wilson also directly asked whether Beierle had been threatened, but again, Beierle couldn't remember: "I was hot; I was fuming, so I didn't really pay attention to his verbiage." Supp. R. Vol. V. But Beierle did tell Deputy Wilson that Redfern had left a voice-mail message on his shop phone at about 7 p.m. (after the incident and the 9-1-1 call). In the message, Redfern had told Beierle, "You don't shoot your gun off in my face in front of my daughter." Supp. R. Vol. II at 316.

After speaking with Deputy Wilson for almost an hour, Beierle agreed to provide a written statement. In three handwritten pages, Beierle summarized what he

5

had just told Deputy Wilson. He said that Redfern "became mouthy" on his return, so Beierle had fired the assault rifle in three bursts: first a few rounds to his right (causing Redfern to hesitate but keep talking), then a few to his left (causing Redfern to get in the car and start backing up), and finally, "a couple more" to oust Redfern from his property. Supp. R. Vol. IV at 564–65. Beierle said that about twenty minutes later, Redfern called his shop and left a threatening voice-mail message. *Id.* at 565. After listening to it, Beierle explained, he left and spent the next few hours at a neighbor's "[t]o avoid retaliation." *Id.*

Two weeks after this initial interview, Deputy Wilson and his supervisor, Sergeant Hollanbach, returned to Beierle's property to retrieve the gun that Beierle had fired. Beierle signed a permission-to-search form, and then led the sergeant and the deputy into his garage, toward "a pretty big gun safe" with a combination lock. Supp. R. Vol. Ib at 141–42. Once at the safe, Beierle started to turn the dial on the lock but paused. He walked to the back of the safe, looked at a piece of paper on which, he told the officers, he kept the combination, and "opened the safe right up." Supp. R. Vol. II at 192. From the safe, Beierle pulled an assault rifle and a loaded magazine and said either, "This is what you're here to get," or, "This is the one you're looking for," before passing the rifle and magazine to Deputy Wilson. Supp. R. Vol. Ib 142–43; Supp. R. Vol. II at 193. In the safe, the deputies saw three more firearms: two rifles and a shotgun.

While Deputy Wilson secured the assault rifle and ammunition that Beierle had handed him, Sergeant Hollanbach asked Beierle, "Correct me if I'm wrong, but

6

don't you have a felony conviction?" Supp. R. Vol. II at 194. Beierle admitted that he did and, in response to the sergeant's next question, explained that he had used his then-wife's social-security number to acquire the assault rifle, as well as another gun, a year or two earlier. Beierle also told the sergeant that the safe and its contents belonged to his father, who was living in California, and that he knew that he needed to return all of it to his father's property. Sergeant Hollanbach then asked Beierle to provide another written statement, and this time Beierle wrote: "This gun was left behind by my ex-wife, and at [sic] the evening in question when all the trash talk became threatening, I grabbed and shot this gun." Supp. R. Vol. IV at 566.

The next morning, Sergeant Hollanbach asked Beierle to come to the sheriff's office to discuss the provenance of the assault rifle in more detail. Beierle complied and, assuring the sergeant that he "didn't forge any of it," described how he had gotten the necessary paperwork from a friend with a Federal Firearms License. Supp. R. Vol. II at 196–97. Beierle had given the paperwork to his then-wife to complete and sign, and then returned it to his friend, who ordered two guns for the couple, including the assault rifle at issue. That rifle, which had been meant as a gift for his then-wife, had stayed with Beierle after the couple divorced. (So too had the other gun; although Beierle claimed to have disposed of it soon after the split.[3]) Sergeant Hollanbach told Beierle that "it wasn't a good idea" to have firearms and ammunition at his home, "with him being a felon," and that "once this was done [Beierle] needed to get the safe moved out and take it back to his dad's house."

---

[3] This gun wasn't one of the four found in the safe.

7

Supp. R. Vol. II at 197. Beierle agreed and said, "You know, when I put the [assault rifle] back in the safe the other day . . . I was thinking about doing that." *Id.* at 197–98.

On February 1, 2013, Beierle voluntarily surrendered a box of ammunition "with a variety of different types in it" to the sheriff's department, and Sergeant Hollanbach sent all of the department's reports to the federal Bureau of Alcohol, Tobacco, and Firearms (ATF). Supp. R. Vol. II at 202. From there, the ATF took over the investigation.

Meanwhile, also in February 2013, Wyoming state prosecutors charged Beierle with (among other crimes) aggravated assault under section 6-2-502(a)(iii) of the state's criminal code. *See* Wyo. Stat. Ann. § 6-2-502(a)(iii) (2017) ("A person is guilty of aggravated assault and battery if he . . . [t]hreatens to use a drawn deadly weapon on another unless reasonably necessary in defense of his person, property or abode or to prevent serious bodily injury to another[.]"). The state dropped all the charges, however, once the federal felon-in-possession prosecution began in May 2013.

The federal case went to trial in February 2014—over a year after the incident—and by then, Beierle had dramatically changed his story. Supported by testimony from a former employee, two friends, and his father, Beierle denied that he had ever possessed, handled, or fired the assault rifle.[4]

---

[4] Beierle stipulated to being a felon and to the assault rifle's interstate nexus.

8

Beierle testified, instead, that after Redfern (who didn't testify) left his daughter behind, Redfern threatened him over the phone, "creat[ing] a fear." Supp. R. Vol. II at 265. So Beierle brought three of his employees, who happened to be working on his property that night, into his shop and "briefed them" on the situation. *Id.* Soon he saw unfamiliar headlights travel up his driveway and recognized Redfern, so he sent Redfern's daughter to the car. When Redfern got out and turned toward Beierle "to continue making his threat," Beierle told his employees, "Whatever happens, happens" and took his own daughter upstairs. *Id.* at 266. According to Beierle, "Nico," one of the three employees, said, "I will handle this," and went outside with another employee. *Id.* at 267. From upstairs, Beierle then heard "screaming, some hollering, and rapid fire of a gun, some silence, maybe a minute or two, . . . [then] another expel of fire, four, maybe five shots[] . . . ." *Id.* at 267–68. Beierle claimed to have fabricated a contrary story for law enforcement because he "d[id]n't know anybody else's situation" (hinting, without quite saying so, that he doubted his Hispanic employees' immigration status).

Beierle further testified that Nico had used an assault rifle that his ex-wife had left behind in his garage, the building next to his shop, after they'd separated. Beierle didn't even see the gun until three days after the incident, when he walked into the shop and saw it lying on a table saw. Without touching the gun, he immediately walked out of the building. Eventually, Beierle called his father in California for the combination to his gun safe, which he wrote on the wall abutting the safe. Then, Beierle passed along the location of the combination to a friend and sometime-

9

employee and asked the man to place the gun in the safe for him. According to Beierle, the man did so while Beierle wasn't home. During cross-examination, Beierle admitted that he'd eventually used a skid-steer loader to move the safe out of his garage and onto his father's property.

The jury didn't believe Beierle's updated version of events. After deliberating for less than five hours, it found Beierle guilty of being a felon in possession of the sole firearm charged—the assault rifle.

Nor did the sentencing court find Beierle's testimony credible. At the first sentencing in June 2014, the court thought that ACCA required a fifteen-year mandatory-minimum sentence, rendering the government's proposed enhancements for specific offense characteristics immaterial. The court nevertheless recognized that if its ACCA analysis turned out to be incorrect, then the § 2K2.1(b)(1)(A) enhancement for multiple firearms would affect the applicable range under the U.S. Sentencing Guidelines. The court therefore stated:

> It is my conclusion that the evidence from trial is sufficient to show actual possession of three or more firearms. The defendant opened the safe after referring to the safe code once he was asked by law enforcement to retrieve the assault rifle. The assault rifle was in the same safe as the other guns that result in the enhancement.

R. Vol. I at 128.

After *Beierle I* vacated Beierle's ACCA-based sentence and remanded for resentencing, *see Beierle I*, 810 F.3d at 1201–02, the district court held a second sentencing hearing in April 2016. At that hearing, the district court addressed the specific-offense-characteristic enhancements in more detail because they, rather than

10

ACCA's mandatory minimum, now guided the sentence. As a threshold matter, the court noted that although its application of § 2K2.1(b)(1)(A) "was perhaps not well stated" during the first sentencing hearing, it remained the court's finding "that the offense involved four firearms." R. Vol. III at 383–84. The court noted that: (1) Beierle had opened the safe; (2) he had handed the assault rifle to Deputy Wilson and Sergeant Hollanbach; (3) at the time, the other three weapons "were in that same safe"; and (4) those three weapons "were as accessible as the assault rifle was to the defendant." *Id.* at 384. Thus, the court concluded, "my finding remains, as stated in the prior sentencing, [that] the two-level enhancement is properly applied because the preponderance of evidence shows actual possession [of the three additional guns] by the defendant." *Id.*

Next, the court turned to § 2K2.1(b)(6)(B)'s four-level enhancement. The court noted that Beierle had twice told law enforcement "that he grabbed the gun and not only threatened to use it but actually did use the weapon against Mr. Redfern." R. Vol. III at 385. And although Beierle had recanted these statements at trial, all of the physical evidence—including the shell casings in Beierle's driveway, the gunshot residue on Redfern's clothing, and the voice-mail message from Redfern accusing Beierle of pointing a gun at him—supported those early statements. "Further," the court found, "there's really no indication of any actions by Mr. Redfern suggesting that it was reasonably necessary for the defendant to threaten or to use the firearm to protect either himself, others, or his own property." R. Vol. III at 385. Accordingly, the court determined that the underlying offense of felon-in-possession "occurred

11

during the commission of aggravated assault and battery under [Wyo. Stat. Ann. § 6-2-502(a)(iii)]." *Id.* at 386.

The court set Beierle's base offense level at 20, because the assault rifle was capable of accepting a high-capacity magazine. Next, the court added two levels because "the offense conduct involved three or more firearms possessed by the defendant," plus four more levels because the offense occurred during the commission of an aggravated assault and battery. *Id.* That offense level, along with Beierle's criminal-history category IV, yielded a sentencing range of 92 to 115 months.[5] But because Beierle had done well enough in prison since his first sentencing that he'd earned a transfer to another facility, the court varied downward two levels for "post-offense rehabilitation." R. Vol. III at 412. In the end, the court resentenced Beierle to seventy-seven months of imprisonment, plus the same three years of supervised release.

Beierle now appeals that sentence.

## DISCUSSION

Beierle acknowledges that because the assault rifle underlying his violation of 18 U.S.C. § 922(g)(1) qualified as "a semiautomatic firearm capable of accepting a large capacity magazine" under § 2K2.1(a)(4)(B), his base offense level is 20. But he

---

[5] Despite the wide and material gulf between Beierle's trial testimony and his interviews with law enforcement, the government never asked the court to apply § 3C1.1's two-level increase for "[o]bstructing or [i]mpeding the [a]dministration of [j]ustice." *See* U.S. Sentencing Guidelines Manual § 3C1.1 cmt. n.4(B), (G) (U.S. Sentencing Comm'n 2013) (listing both the commission of perjury and the provision of "materially false statement[s] to a law enforcement officer" as examples of conduct covered under this enhancement).

12

disputes the district court's application of two enhancements based on the specific characteristics of his offense: (1) a two-level enhancement under § 2K2.1(b)(1)(A) because the "offense involved" between three and seven firearms, and (2) a four-level enhancement under § 2K2.1(b)(6)(B) because he "used or possessed" a firearm "in connection with another felony offense"—specifically, aggravated assault as defined in Wyo. Stat. Ann. § 6-2-502(a)(iii).

In considering a sentencing challenge such as Beierle's, we review the district court's interpretation of the sentencing guidelines de novo but its factual determinations for clear error, *United States v. Hoyle*, 751 F.3d 1167, 1172, 1174 (10th Cir. 2014), remembering that the government must prove any fact underlying a sentence enhancement by a preponderance of the evidence, *United States v. Garcia*, 635 F.3d 472, 478 (10th Cir. 2011). Under the clear-error standard, we can't substitute our own judgment for the district court's. *Garcia*, 635 F.3d at 478. Rather, we must look at the evidence and resulting inferences in the light most favorable to the district court's factual findings, and we may disturb those findings only if they have no basis in the record. *Hoyle*, 751 F.3d at 1174.

With that dual standard of review in mind, we address the challenged sentence enhancements in turn.

A. **Section 2K2.1(b)(1)(A)'s Two-Level Enhancement for Offenses Involving Three or More Firearms**

Section 2K2.1(b)(1)(A) states that if "the offense involved" between three and seven firearms, then the sentencing court should add two offense levels. "For

13

purposes of calculating the number of firearms under [this subsection]," Application Note 5 tells us to "count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or unlawfully distributed, including any firearm that a defendant obtained or attempted to obtain by making a false statement to a licensed dealer." U.S. Sentencing Guidelines Manual § 2K2.1 n.5 (U.S. Sentencing Comm'n 2013). From these listed unlawful activities, the district court concluded that "the preponderance of the evidence show[ed] actual possession." R. Vol. III at 384. Beierle now challenges this determination, arguing that he never had actual possession of any firearm other than the one underlying his conviction. Because Beirele did not make this objection in the district court, we review for plain error. *United States v. Lin*, 410 F.3d 1187, 1190 (10th Cir. 2005).

"Actual possession exists when a person has direct physical control over a thing." *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015). Beierle's early statements to the deputies, as well as the physical evidence recovered outside the shop, establish that Beierle picked up the assault rifle and fired it. But the government concedes in its briefing[6] that it had no evidence that Beierle had ever taken actual possession of any of the three other firearms found in the safe. We agree that the district court legally erred by equating accessibility of the other three

---

[6] In its brief, the government stated that the record was "clear" regarding the absence of actual possession. Appellee's Br. at 23. But at oral argument, the government wavered, suggesting that Beierle was in actual possession of all four firearms when he used a loader to move the safe. Nothing in the record suggests that any of the firearms was in the safe while Beierle moved it, though. And even if such evidence existed, we think it a stretch to hang a determination of actual possession on such gossamer.

14

firearms with "actual possession," R. Vol. III at 384, and that this error was plain.
*See Henderson*, 135 S. Ct. at 1784 (explaining that a felon who "hold[s] his firearms himself" is in actual possession); *see also United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998) (explaining, in the context of instructional error, that an error is "plain" if it is "contrary to well-settled law").

Though Beierle has met his burden to show the first two prongs of the plain-error analysis, he fails on the third. *See* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States v. McGehee*, 672 F.3d 860, 876 (10th Cir. 2012) (explaining that to "successfully run the gauntlet" of plain-error review, a defendant must demonstrate (1) an error that (2) is plain, (3) affects substantial rights (meaning that it affected the outcome of the proceedings), and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings). He has not shown prejudice from the error, that is, a reasonable probability that the error led to a different sentencing outcome. *See Lin*, 410 F.3d at 1190–91.

Beierle fails on the prejudice prong because the evidence shows that he constructively possessed the other three firearms in the safe. Section 2K2.1(b)(1)(A) covers both constructive and actual possession of firearms. *United States v. Gambino-Zavala*, 539 F.3d 1221, 1228–29 (10th Cir. 2008). And the district court's use of the phrase "actual possession" doesn't confine our appellate review to that form of possession. "We have long said that we may affirm [the district court] on any basis supported by the record, even if it requires ruling on arguments not reached by

15

the district court . . . [,]" provided that (1) we have the power to consider the alternate ground and (2) the opposing party has had a fair chance to address it. *Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011) (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)). As the Supreme Court explained in *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943), "It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate."

The parties to this case have already battled, in their appellate briefing and at oral argument, over the existence of constructive possession. The record on appeal contains the facts to support their arguments. So it's both efficient and fair to reframe the question: Was Beierle in *constructive* possession of the three other firearms in the safe, even if the evidence didn't show that he was in *actual* possession of them? *Cf. Jordan*, 668 F.3d at 1200.

In evaluating this question, we are mindful of a recent change in our circuit's law about what it means for a person to constructively possess something. Just months after Beierle filed his notice of appeal, we published *United States v. Little*, 829 F.3d 1177 (10th Cir. 2016).[7] To establish constructive possession before *Little*, the government didn't need to prove that an individual *intended* to exercise dominion or control over an object. *See United States v. Colonna*, 360 F.3d 1169, 1179 (10th

---

[7] Beierle's case was on direct appeal when we issued *Little*, so he gets the benefit of its ruling, whatever that may be. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987).

Cir. 2004), *overruled by Little*, 829 F.3d at 1182. Instead, the government met its burden by proving that a defendant had known about the firearm and had power to exercise dominion or control over it. *Colonna*, 360 F.3d at 1178–79. But as we explained in *Little*, 829 F.3d at 1182, the Supreme Court's intervening decision in *Henderson* changed all that. "In *Henderson*, the Court squarely held that constructive possession requires both power to control an object *and intent to exercise that control.*" *Little*, 829 F.3d at 1182 (emphasis added); *see also Henderson*, 135 S. Ct. at 1784 (explaining that constructive possession exists when a person who lacks direct, physical control over an object "still has the power and intent to exercise control over" it).

Here, the district court had abundant evidence that Beierle had the power and intent to exercise control over the firearms seized from the safe in his shop.[8] Beierle showed his power to control the firearms when, using a combination that he had written down, he opened the safe in front of the deputies, selected one of the four firearms inside, and passed it to Deputy Wilson and Sergeant Hollanbach with the statement, "This is the one you're looking for." All four firearms were cached on Beierle's property, in a shop that he solely occupied, in a safe that he alone on the

---

[8] Despite the government's concession that *Little* applies to Application Note 5, we don't decide the issue today. *See Massachusetts v. United States*, 333 U.S. 611, 624 n.23 (1948) ("We are not bound to accept [the government's concession] as either sound or conclusive of the litigation."). Beierle's inability to show the substantial-prejudice prong of plain error would subsume any ruling that we made on the matter.

17

property could open. The only other person with the combination (his father) was over a thousand miles away.

In *Little*, we reached the same conclusion under similar circumstances. There, law enforcement found two stolen guns in a cramped "well house" that Little rented from a woman who lived on the same property, in a nearby trailer. *Little*, 829 F.3d at 1180. One of the guns was inside a duffel bag that was either in or under a sleeping bag on the bed (which took up the length of the house and was the only place to sit). *Id.* The other gun was under the bed. *Id.* Ammunition was also plainly visible. *Id.* Furthermore, about the time that the guns had been reported stolen, Little had placed a lock on the well house's door. *Id.* at 1183. Then, on the day that officers searched the well house, they saw Little leave the well house about seven-and-a-half minutes after they arrived and began talking to Little's landlady. *Id.* at 1180, 1183. Under these circumstances, we determined that it would have been unreasonable for a jury to conclude that Little didn't know about the weapons' presence, or that he didn't intend to exercise command over their locations. *Id.* at 1183.

In *Little*, 829 F.3d at 1183, we determined that the evidence would have "compelled" a properly instructed jury to find *beyond any doubt* that the defendant intended to exercise control over the weapons in the well house.[9] By comparison, the

---

[9] The facts of *Little* "left [the court] with no doubt that [the defendant] intended to exercise control over the weapons." *Id.* at 1183 n.4. That conclusion grew out of the government's failure to argue harmless error and the court's resultant burden to determine whether the error's harmlessness was certain, an analysis "necessarily more stringent than the 'reasonable doubt' test we would apply had the government thoroughly developed its harmlessness argument." *Id.* (citing *Mollett v.*

18

circumstances of this case need show by only *a preponderance of the evidence* that Beierle intended to exercise control over the weapons in the safe. Because the record supports such a finding, Beierle can't establish the prejudice prong of plain error.

For these reasons, we decline to command a do-over just to allow the district court to correct its colloquial, rather than technical, use of the term "actual possession." *See Jordan*, 668 F.3d at 1200. Instead, we affirm the district court's application of § 2K2.1(b)(1)(A)'s two-level enhancement, though on grounds of constructive, rather an actual, possession of the three additional firearms.

**B.    Section 2K2.1(b)(6)(B)'s Four-Level Enhancement for Defendants Who Use or Possess a Firearm in Connection with Another Felony Offense**

Section 2K2.1(b)(6)(B) provides that if the defendant "used or possessed any firearm or ammunition in connection with another felony offense," then the sentencing court should apply a four-level increase. Here, the district court applied this enhancement because Beierle had used the assault rifle "in connection" with his commission of aggravated assault under Wyo. Stat. Ann. § 6-2-502(a)(iii). Beierle claims that this finding was clearly erroneous.

Section 6-2-502(a)(iii) provides that an individual is guilty of aggravated assault and battery if he "[t]hreatens to use a drawn deadly weapon on another." The statute excuses such conduct, however, when it is "reasonably necessary in defense of [the individual's] person, property or abode or to prevent serious bodily injury to another." *Id.* Latching on to this exception, Beierle claims that the district court

---

*Mullin*, 348 F.3d 902, 920 (10th Cir. 2003); *United States v. Serawoop*, 410 F.3d 656, 669 (10th Cir. 2005)).

19

clearly erred in finding that "there[was] really no indication of any actions by Mr. Redfern suggesting that it was reasonably necessary for [Beierle] to threaten or to use the firearm to protect either himself, others, or his own property." R. Vol. III at 385. The events of that January night, Beierle points out, were disputed. Thus, although the district court "chose to credit" the government's version, "within [the] universe of facts, there was in fact an 'indication' that Mr. Beierle was threatened, and that it was, therefore, 'reasonably necessary' for him to threaten to use or to use the firearm for protection." Aplt.'s Opening Br. at 23.

The existence of an alternate version of events, however, isn't enough to render the district court's finding clearly erroneous. To succeed with this argument, Beierle would have to convince us not merely that the record provided some basis for a different finding, but that the district court's finding itself was implausible or impermissible in light of the record. *Garcia*, 635 F.3d at 478. And he would have to do so through a prism that casts the evidence and the inferences therefrom in the light most favorable to the district court's finding, *United States v. Kitchell*, 653 F.3d 1206, 1226 (10th Cir. 2011), and in a context where the district court's credibility determinations are "virtually unreviewable," *Hoyle*, 751 F.3d at 1175 (quoting *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003)). Based on the record, he can't make that showing.

To the contrary, the record contains plenty of evidence that Beierle committed aggravated assault and battery and that his actions weren't "reasonably necessary" under Wyo. Stat. Ann. § 6-2-502(a)(iii). Two days after the incident, when Deputy

20

Wilson specifically asked whether Redfern had threatened him, Beierle couldn't remember; he explained that he had been too angry. Beierle could recall only that Redfern had been "mouthy" and that he'd been "talking crap, mumbo jumbo." Supp. R. Vol. IV at 135; Supp. R. Vol. 1b at 135. Based on Beierle's own words, then, the district court didn't clearly err in finding that nothing Redfern did or said justified getting threatened with a drawn deadly weapon.

Beierle's assertion (in his second written statement) that he "grabbed and shot" the assault rifle only "when all the trash talk became threatening" doesn't change this analysis. Supp. R. Vol. IV at 566. To avoid committing clear error, the district court didn't have to address each potentially contradictory fact in the record. And viewing the second written statement in the light most favorable to the court's finding, the statement is probably less credible than Beierle's earlier statement, in which he didn't mention feeling threatened. Moreover, even accepting the truth of the second statement, "trash talk" (even when it "bec[omes] threatening," Supp. R. Vol. IV at 566) doesn't warrant firing a gun at the trash-talker. *Cf. Hernandez v. State*, 976 P.2d 672, 676 (Wyo. 1999) (explaining, in the context of aggravated assault under section 6-2-502(a)(ii), that "the law of self-defense in Wyoming is a defense of necessity which is evaluated under the totality of the circumstances and in light of what is reasonable and appropriate").

Accordingly, the district court didn't err in concluding by a preponderance of the evidence that Beierle "used or possessed" the assault rifle "in connection with another felony offense" under § 2K2.1(b)(6)(B). *Cf. Hoyle*, 751 F.3d at 1175

(rejecting the argument that the district court clearly erred when, in applying § 2K2.1(b)(6)(B), it credited the testimony of a witness with a prior theft conviction). We therefore affirm the district court's application of the four-level enhancement.

## CONCLUSION

The district court didn't err in applying either of the two challenged sentencing enhancements under § 2K2.1 of the guidelines. We therefore affirm (although on slightly different grounds) Beierle's new, seventy-seven-month prison sentence.

Entered for the Court


Gregory A. Phillips
Circuit Judge

22